IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NORTHERN CALIFORNIA RIVER WATCH, et al., | No. C 06-06685 CRB |
| Plaintiffs, | **MEMORANDUM AND ORDER** |
| v. | |
| CARL WILCOX, et al., | |
| Defendants. / | |

This is an Endangered Species Act ("ESA") case involving a plant, the Sebastopol meadowfoam. Now pending before the Court are the motions for summary judgment of the Schellinger defendants and the individual California Department of Fish and Game defendants, Carl Wilcox and Gene Cooley, as well as plaintiffs' cross motion for summary judgment. The parties' motions present a question of first impression: whether "areas under Federal jurisdiction" in ESA section 9(a)(2)(B) encompasses wetlands adjacent to navigable waterways and therefore subject to the requirements of the Clean Water Act.

## BACKGROUND FACTS

The Schellinger defendants (collectively "Schellinger") propose to develop approximately 21 acres of land in Sebastopol, California ("the Site"). The Site includes grasslands containing seasonal vernal pools, wetlands, seasonal creeks, vernal pools and vernal swales. The Sebastopol meadowfoam, an endangered plant species under the ESA,

has been found at the Site.

In 2003 the Army Corps of Engineers ("ACOE") certified 1.84 acres of the Site as wetlands subject to the permitting requirements of the Clean Water Act. The designation was based upon the ACOE's findings that the designated area met all the requirements to be classified as wetlands and the wetlands are adjacent to navigable waters of the United States, namely, the Laguna de Santa Rosa, the largest tributary of the Russian River. As a result of the designation, Schellinger must obtain an ACOE permit before he can fill and dredge the wetlands. Plaintiffs offer evidence that the Sebastopol meadowfoam grows within the ACOE designated wetlands.

On May 9, 2005, defendant Carl Wilcox, a Habitat Conservation Manager with the California Department of Fish and Game ("Fish and Game"), and defendant Gene Cooley, a Fish and Game botanist, visited the Site with Schellinger to examine the Sebastopol meadowfoam. Plaintiffs allege that the defendants damaged the meadowfoam during their examination. On May 23, 2005, Cooley and Wilcox returned to the Site and removed the wetlands meadowfoam, placed them in plastic bags, and transported them to the local Fish and Game Office. Cooley and Wilcox assert that they confiscated the meadowfoam because they believed that it was not naturally occurring on the Site and had been intentionally placed there from another location. Whether the meadowfoam are naturally occurring at the Site is disputed.

**PROCEDURAL HISTORY**

Plaintiff Northern California River Watch and several individuals filed this action against Cooley and Wilcox and the Schellinger defendants under ESA section 9(a)(2)(B). Plaintiffs allege that defendants' conduct harmed the endangered Sebastopol meadowfoam.

Defendants made an early summary judgment motion. They argued that their conduct did not violate ESA section 9(a)(2)(B) as a matter of law as to the Sebastopol meadowfoam. First, they argued that the meadowfoam were removed from private land and therefore the Act does not apply. Second, they argued that no claim could be stated against them because

2

United States District Court
For the Northern District of California

Cooley and Wilcox removed the meadowfoam in accordance with California law as part of their official management and law enforcement duties.

The Court denied defendants' motion for summary judgment. With respect to the jurisdictional issue, the Court held that defendants' cursory argument had not persuaded the Court that "areas under Federal jurisdiction" is limited to lands owned by the federal government. The Court also held that it was premature to conclude that no reasonable trier of fact could find that Cooley and Wilcox did not remove the meadowfoam as part of their official management and law enforcement duties.

Now that discovery is complete, defendants renew their summary judgment motions.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56©). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the non-moving party, and a dispute is "material" only if it could affect the outcome of the suit under governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). A principal purpose of the summary judgment procedure "is to isolate and dispose of factually unsupported claims." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

A party moving for summary judgment that does not have the ultimate burden of persuasion at trial has the initial burden of either producing evidence that negates an essential element of the non-moving party's claims or showing that the non-moving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial. See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000). Where the party moving for summary judgment would bear the burden of proof at trial, it

bears the initial burden of producing evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000). If the moving party does not satisfy its initial burden, the non-moving party has no obligation to produce anything and summary judgment must be denied. If, however, the moving party satisfies its initial burden of production, then the non-moving party may not rest upon mere allegations, or denials of the adverse party's evidence, but instead must produce admissible evidence to show there exists a genuine issue of material fact. See Nissan Fire & Marine, 210 F.3d at 1102.

## DISCUSSION

Under ESA section 7 a federal agency is required to consult with the Fish and Wildlife Service to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). This section 7 consultation requirement applies equally to endangered fish, wildlife and plants. See 16 U.S.C. § 1532(16) (defining "species" as used in the ESA to "include[] any subspecies of fish or wildlife or plants").

ESA sections 9 and 10, in contrast, treat plants differently from fish and wildlife. Pursuant to ESA section 9, it is unlawful to "take," that is, "harm," endangered fish or wildlife "within the United States or the territorial seas of the United States." 16 U.S.C. § 1538(a)(1)(B). Accordingly, the fish and wildlife protections apply anywhere in the United States. Under ESA section 10 a private party may apply to the Fish and Wildlife Service for an "incidental take permit" that allows the landowner to harm a given number of endangered fish or wildlife under certain conditions. 16 U.S.C. § 1539(a)(B); Oregon Natural Resources Council v. Allen, 476 F.3d 1031, 1032 n.2 (9th Cir. 2007).

With respect to plants, section 9 makes it is unlawful to

> remove and reduce to possession any such species from *areas under Federal jurisdiction*; maliciously damage or destroy any such species on any such area; or remove, cut, dig up, or damage or destroy any such species on any other area in knowing violation of any law or regulation of any State.

16 U.S.C. § 1538(a)(2)(B) (emphasis added). Thus, the prohibition on removing and reducing to possession and maliciously damaging or destroying endangered plant species

4

only applies in "areas under Federal jurisdiction." However, a person may not "remove, cut, dig up, or damage or destroy" endangered plant species *on any other area,* that is, an area not under Federal jurisdiction, provided the act was done in knowing violation of state law.

ESA plant protections differ from fish and wildlife in another respect: section 10–allowing a private party to apply for an incidental take permit–applies only to fish and wildlife; there is no section 10 incidental take permit provision for endangered plants. See 16 U.S.C. § 1539(a)(1)(B)(providing that the Fish and Wildlife Service may permit "any taking otherwise prohibited by section 1538(a)(1)(B) [prohibiting the harming of fish and wildlife] . . . if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity").

Plaintiffs have filed this action under the plant protections of section 9. They allege that Wilcox and Cooley "removed and reduced to possession" endangered meadowfoam from "an area under Federal jurisdiction" and that even if the Site is not under Federal jurisdiction within the meaning of the ESA, Wilcox and Cooley (with assistance from the Schellinger defendants) harmed the meadowfoam in knowing violation of California law. Defendants move for summary judgment on the ground that the Site is not an "area under Federal jurisdiction" and plaintiffs cannot prove a knowing violation of California law.

**A. Areas under Federal jurisdiction**

It is undisputed that the United States does not have any title to the land on which the meadowfoam was found. Plaintiffs' theory is that the Site is an area "under Federal jurisdiction" because it is covered by the Clean Water Act. In particular, plaintiffs argue that the ACOE's certification of 1.84 acres of the Site as wetlands subject to the permitting requirements of the Clean Water Act means that it is an "area under Federal jurisdiction." See Northern California River Watch v. City of Healdsburg, 496 F.3d 993, 997 (9th Cir. 2007) (confirming that wetlands adjacent to navigable water are covered by the Clean Water Act). Plaintiffs also argue that because the wetlands are covered by the Clean Water Act, the Schellinger defendants require a permit from the ACOE to fill and dredge the wetlands. See 33 U.S.C. § 1344. This federal action–considering the permit application–triggers the ESA

section 7 consultation process. See Save Our Sonoran, Inc. v. Flowers, 408 F.3d 1113, 1118 (9th Cir. 2005). According to plaintiffs, this is a second, related reason the Site, or at least the 1.84 acres of ACOE designated wetlands, is an area "under Federal jurisdiction."

**1. Law of the case**

Plaintiffs first contend that the Court has already ruled on the jurisdictional question and therefore defendants are "judicially estopped" from rearguing the issue. This Court's ruling on defendants' early motion for summary judgment was narrow. Plaintiffs had not cross-moved for summary judgment; thus, the Court did not rule that the Site is "under Federal jurisdiction" within the meaning of the ESA. Indeed, the Court did not define "areas under Federal jurisdiction." The Court merely ruled that in light of defendants' unsupported argument, defendants had not persuaded the Court that "areas under Federal jurisdiction" means only "owned by the federal government"–the only argument made by defendants at that time.

On the parties' pending cross-motions for summary judgment, which are made after the parties have had the opportunity to develop a factual record, the jurisdictional issue is presented in context. The Court has not finally resolved this question and must do so now.

**2. Regulatory jurisdiction**

When the ESA was enacted in 1973 it merely prohibited the importation or sale of endangered plant species. Pub. L. No. 93-205,1973 S.1983. Congress amended the ESA in 1982 by making it unlawful to "remove and reduce to possession any . . . [plant] species from areas under Federal jurisdiction." Pub. L. No. 97-304,1982 H.R. 6133. Congress again amended the Act in 1988 to include the current language. 16 U.S.C. § 1538(a)(2). Congress did not explain what it meant by "areas under Federal jurisdiction."

The Court concludes that, whatever "areas under Federal jurisdiction means," it is not so broad as to encompass wetlands that are adjacent to navigable waters and therefore subject to the requirements of the Clean Water Act. There is nothing in the language or structure of the Act that suggests Congress had such "regulatory" jurisdiction in mind when it used the words "areas under Federal jurisdiction." To the contrary, an examination of the statute as a

6

whole reveals that Congress did not intend the "removal and reduce to possession" portion of section 9(a)(2)(B) to apply to private property that is merely regulated by the federal government. See Robinson v. Shell Oil Co., 519 U.S. 337, 341 (1997) (to determine statutory meaning a court must look at the statute's "language itself, [but also to] the specific context in which that language is used, and the broader context of the statute as a whole").

As plaintiffs emphasized at oral argument, the ESA provides greater protections for fish and wildlife than for plants. Yet, under plaintiffs' interpretation of "areas under Federal jurisdiction," plants found on private property that is regulated by the federal government under a federal law, such as the Clean Water Act, are entitled to more protections than fish and wildlife found on the same property. As is explained above, under ESA section 10 a private party may apply for an incidental take permit for fish and wildlife. These permits allow a landowner to "take" an endangered fish or wildlife if the "taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). The ESA, however, includes no such concomitant authorization for the removal of endangered plants. This omission is consistent with an interpretation of "areas under Federal jurisdiction" that does not include regulatory jurisdiction; there is no need for incidental take, or, in the case of plants, incidental removal permits for endangered plants if ESA section 9(a)(2)(B) does not cover private property. To accept plaintiffs' interpretation would mean that the removal of endangered plants on private property that is regulated by the federal government under some statute is nearly absolutely prohibited, but that exceptions (incidental takes) can be made for fish and wildlife on the same property.[1] Such an interpretation is inconsistent with the ESA's greater protections for fish and wildlife.

The Court's interpretation is consistent with the legislative history. For example, the Senate Report on the 1988 amendment explains that under the then current law "it is not

---

[1] A party may apply for a permit to import, remove, transport, etc. a plant in violation of section 9(a)(2) provided the conduct is for scientific purposes or for enhancing the propagation or survival of endangered plants. See 50 C.F.R. § 17.62. Such exception is much narrower than a section 10 incidental take permit.

7

unlawful to pick, dig up, cut or destroy an endangered plant unless the act is committed *on Federal land*; and even *on federal land*, there is no violation of the Act unless the plant is removed from the *area of Federal jurisdiction*." S. Rep. No. 100-240, 12; 1988 U.S.C.C.A.N. 2700, 2711-2712 (1987); see also id. at 2701 ("The bill makes it unlawful to damage or destroy a plant on federal lands or in violation of a State law or in the course of any violation of a State criminal trespass law."). Thus, in this Report Congress equated "areas under Federal jurisdiction" with "federal land." Similarly, the 1982 House Conference Report explains that the amendment prohibits "the removal and reduction to possession of any endangered plant that is on federal land." H.R. Conf. Rep. No. 97-835, 35; 1982 U.S.C.C.A.N. 2860, 2876 (1982). Wetlands subject to the Clean Water Act because they are adjacent to navigable waters cannot reasonably be considered "federal land."

Plaintiffs argue that the Fish and Wildlife Service itself has interpreted "areas under Federal jurisdiction" as encompassing areas subject to the Clean Water Act. As evidence of this interpretation plaintiffs point to the Fish and Wildlife Service's Final Rule classifying the Sebastopol meadowfoam as an endangered plant. 56 FR 61173. The Court has reviewed the Final Rule and does not find anything in the discussion that suggests the Service has interpreted "areas under Federal jurisdiction" as broadly as plaintiffs urge. To the contrary, the Service emphasizes that the benefit of listing the meadowfoam as an endangered plant is that the ACOE will be required to consult with the Service pursuant to ESA *section 7* before issuing any fill and dredge Clean Water Act permits for wetlands where the meadowfoam is found. Id. at 61180. The only mention in the Rule of section 9 is a paragraph at the end which merely describes what section 9 prohibits, including, making it illegal to "remove and reduce to possession any such species from areas under Federal jurisdiction." Id. at 61181.

Plaintiffs' reliance on the declaration of Peter Baye, a former ACOE and Fish and Wildlife Service is equally unpersuasive. Baye opines that in his experience "potential violations of Section 9's plant protections were always considered when jurisdictional wetlands were involved as these were always understood by us at the Services as areas under federal jurisdiction. In all my experience I have never known of any incident . . . in which a

8

landowner challenged the Services exercising ESA jurisdiction over federally listed plants in jurisdictional wetlands on their private lands." Baye Decl. ¶ 8.

Baye's testimony, however, is consistent with the Service's regulation of private landowners under ESA section 7, as discussed in the Final Rule classifying the meadowfoam as an endangered species. His declaration is not persuasive evidence that the Fish and Wildlife Service has enforced section 9's prohibition of removal from areas "under Federal jurisdiction" against purely private land. The bottom line is that plaintiffs do not identify a single case or administrative proceeding in which section 9(a)(2)(B) has been applied in a similar situation. This Court declines to be the first.

Finally, although no case has addressed whether "areas under Federal jurisdiction" includes areas under federal jurisdiction pursuant to the Clean Water Act, plaintiffs note that in Save Our Sonoran, Inc. v. Flowers, the Ninth Circuit equated Clean Water Act jurisdiction with being "under the jurisdiction of the federal government." 408 F.3d at 1118. The question, here, however, is not what language courts have used in Clean Water Act cases to characterize the federal government's regulation of navigable waters; the issue is the meaning of "area under Federal jurisdiction" in ESA section 9(a)(2)(B).

In sum, the Court concludes that plaintiffs have not met their burden of proving that the Site, or any part of the Site, is an area "under Federal jurisdiction" within the meaning of ESA section 9(a)(2)(B). Defendants are entitled to summary judgment on this claim.

**B.    Knowing violation of state law**

Having determined that the Fish and Game defendants' removal of the meadowfoam from the Site was not from "an area under Federal jurisdiction" as that term is used in ESA section 9(a)(2)(B), the Court must still address whether a reasonable trier of fact could find that these defendants removed the meadowfoam in knowing violation of state law. See 16 U.S.C. § 1538(a)(2)(B).

The California Endangered Species Act and Native Plant Protection Act prohibit the taking of endangered plant species. However, California Department of Fish and Game regulations provide that "[t]he possession or take of endangered, threatened, or candidate

species by employees and agents of the Department for scientific, educational and management purposes, and for law enforcement purposes, is not prohibited." Cal. Code. Regs. tit. 14, § 783.1. The California Fish and Game Code also provides that "an employee or agent of the department may, in the enforcement of this chapter, . . . confiscate plants or parts thereof when unlawfully taken, transported, possessed, sold, or otherwise . . . ." Cal. Fish & Game Code § 1910.

Wilcox and Cooley offer evidence that they removed the meadowfoam from the Site on May 23, 2005 because they believed that the meadowfoam had been illegally transferred to the Site. Whether removal was the most appropriate response is immaterial; if Wilcox and Cooley removed the meadowfoam based on their belief that it had been transplanted, they were indisputably acting for a law enforcement purpose or, at least, not in *knowing* violation of state law.

Plaintiffs argue that summary judgment must be denied because there is a genuine dispute of fact. They contend that the evidence supports a finding that "Wilcox assisted Schellinger's consultant Marco Waaland in creating the fiction of the transplanted Sebastopol meadowfoam" and that Cooley cooperated under pressure from his superiors to do something. Plaintiffs' Opposition at 16. The evidence plaintiffs identify, however, does not reasonably support such an inference.

First, plaintiffs dispute that the plants were in fact transplanted. They note that Liam Davis, a Fish and Game biologist, observed the meadowfoam on April 26, 2005 and concluded that they were "extant," that is, naturally occurring at that location. This dispute alone does not create a genuine issue as to whether Cooley and Wilcox acted in knowing violation of state law. Cooley and Wilcox may have been wrong about the transplantation, but that does mean they were not acting for a management or law enforcement purpose.

Second, plaintiffs cite evidence that suggests that Waaland attempted to persuade Davis and Wilcox that the plants had been transplanted. This fact, too, does not support a finding that Wilcox merely pretended the plants had been transplanted; it merely suggests that Wilcox reached the same conclusion as Waaland.

10

Third, plaintiffs contend that despite Wilcox's knowledge of Davis's conclusion, and before any other official's visit to the Site, Wilcox tried to convince his colleague Cooley that the plants were transplanted. The evidence cited by plaintiffs, however, does not refer to Wilcox trying to convince Cooley of anything. To the contrary, it suggests that Dr. Northern, a Sonoma State biologist, first contacted Fish and Game to report that had visited the Site at the request of a local resident and had observed meadowfoam. Shortly thereafter Waaland contacted Fish and Game to share his opinion that the meadowfoam had been transplanted. In response to these contacts Davis visited the Site and thereafter Wilcox and Cooley. Nothing in these facts suggests that Wilcox prematurely attempted to persuade Cooley that the meadowfoam had, in fact, been transplanted.

Fourth, plaintiffs argue that there was no real investigation of the alleged transplantation. They fail to offer any evidence, however, that Cooley and Wilcox violated specific protocols or procedures for conducting such an investigation or any other evidence that would give rise to an inference that the investigation was a sham. There is also no evidence of any "tampering" as alleged–but not supported–by plaintiffs. The cited evidence demonstrates that Cooley placed the removed meadowfoam in a Fish and Game evidence locker and other plants in a tub of water to keep them alive.

Finally, plaintiffs assert that Cooley admits that he removed the meadowfoam from the Site despite warnings from the ACOE and Fish and Wildlife Service to the contrary. Again, the evidence cited–Cooley's May 13, 2005 report on his investigation–does not come close to supporting plaintiffs' characterization. The report merely suggests that after Fish and Game communicated its belief that the meadowfoam had been transplanted to the ACOE and Fish and Wildlife Service, the federal agencies responded that it does not matter how the plants got to the Site, their presence should still be considered during the ESA section 7 consultation process. The Court has reviewed the other evidence cited by plaintiffs and find it similarly unpersuasive.

In sum, based on the evidence in the record, no reasonable trier of fact could find that Wilcox or Cooley acted in knowing violation of state law, that is, that they were not acting

11

for management or law enforcement purposes when they removed the meadowfoam from the Site. Defendants are entitled to judgment on this claim too.

## CONCLUSION

Plaintiffs bear the burden of proving that defendants violated the ESA when Cooley and Wilcox, both Fish and Game employees acting in their capacity as such, removed the meadowfoam from the Site. As plaintiffs have not proved that the Site is an "area under Federal jurisdiction" within the meaning of ESA section 9(a)(2), and as they have not identified evidence sufficient to support a finding by a reasonable trier of fact that Cooley and Wilcox removed the meadowfoam in knowing violation of state law, defendants' motion for summary judgment on the meadowfoam claims is GRANTED.

Defendants also move for summary judgment on plaintiffs' claims concerning the endangered California Tiger Salamander. In response plaintiffs moved to amend their complaint to omit any allegations as to the Salamander. At oral argument the Court denied the motion to amend, explaining that if plaintiffs do not wish to pursue such claims at this late date they should simply dismiss them. Since oral argument plaintiffs have not moved to dismiss the claims; nonetheless, as plaintiffs have indicated that they do not intend to prosecute those claims, the Court hereby DISMISSES them pursuant to Federal Rule of Civil Procedure 41(b).

**IT IS SO ORDERED.**

Dated: March 6, 2008

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE